# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 3, 2002

## STATE OF TENNESSEE v. MONTRELL CLEMENTS

### Direct Appeal from the Criminal Court for Shelby County
### Nos. 00-14457, 00-14458    John P. Colton, Jr., Judge

### No. W2002-01139-CCA-R3-CD - Filed May 16, 2003

The defendant, Montrell Clements, was convicted of aggravated rape and aggravated assault and sentenced to twenty-two years and six years, respectively, to be served concurrently. The defendant timely appealed, arguing that the evidence was insufficient to support his convictions. Following our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment in No. 00-14457 to reflect the defendant's conviction offense, which was omitted from the judgment form.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of a Corrected Judgment

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender, and Tony N. Brayton (on appeal), Donna J. Armstard (at trial), and Glenda A. Adams (at trial), Assistant Public Defenders, for the appellant, Montrell Clements.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michael S. Davis and Scot A. Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

During the early morning hours of July 29, 2000, the victims, Rosemary Sutton and her three-year-old son, William Turner, were home alone at 1039 North Dunlap Street in Memphis as Sutton's husband, Willie Turner, was working an 11:30 p.m. to 7:30 a.m. shift. Mr. Turner's brother, Robert Prince, who also lived at the residence, knocked on the door around 5:00 a.m. after Sutton had been awakened by her son who had wet the bed. Recognizing Prince at the door, Sutton allowed him

inside. She then took her son to the bathroom to wash him and, while they were in the bathroom, she heard another knock at the door. Prince told her he would answer the door and did so.

A few minutes later, Sutton heard glass breaking and then a gunshot coming from the kitchen. As she came out of the bathroom with her son, she saw the defendant coming from the kitchen. Pointing a small, black revolver to her face, the defendant told her, "Bitch, I'm going to kill you." Sutton's young son, who was standing beside her, began to cry, and the defendant then pointed the gun at his face and said, "[S]hut up Little Man. I'm going to kill you too." Sutton pleaded with the defendant not to hurt her son because he was deaf. The defendant demanded that Sutton leave with him and started toward the front door. When he turned around to open the door, Sutton pushed him outside and ran with her son to her son's bedroom where she barricaded the door with a chair. She next heard a second gunshot and the sound of more breaking glass. The defendant then kicked in the bedroom door, pointed the gun at her face, and ordered her to follow him. Once they reached the living room, the defendant told Sutton's son to "shut up," hit Sutton in the back of the head with the gun, and then pushed her son down. After being struck with the gun, Sutton fell to the ground and the defendant began dragging her, kicking and screaming, by her shirt collar out of the house. The defendant drug her across her front lawn, her next-door neighbor's front lawn, and into the next neighbor's backyard, where he again hit her in the head with his gun and told her he was going to kill her. Pointing the gun at her face, the defendant forced Sutton to perform oral sex on him and then said, "Bitch, take all your clothes off." After vaginally raping her, the defendant got up, pulled Sutton up by the hair of her head, "took his penis and . . . put it back in [her] mouth," saying, "Bitch, if you bite me, I'll kill you." Still at gunpoint, the defendant again vaginally raped Sutton. Seeing a police spotlight, the defendant then got up and ran. Sutton ran to her next-door neighbor's house where she was given some towels to cover herself. Sutton showed police officers the direction in which the defendant had fled. Shortly thereafter, the police apprehended the defendant, and Sutton identified him as her attacker. Sutton was subsequently taken to the Rape Crisis Center for treatment.

At trial, Sutton identified several photographs taken of the crime scene that morning, as well as photographs of her grass-stained boxer shorts, underwear, and torn, bloodstained T-shirt that she had been wearing. Sutton testified that her injuries included a "big knot" on her forehead, bleeding from the side of her head, and lacerations to her back and buttocks. Photographs depicting the victim's injuries, taken at the Rape Crisis Center, were also admitted into evidence.

Robert Prince testified that he arrived home at approximately 4:45 a.m. on July 29, 2000, and the defendant knocked on the front door around 5:00 a.m. to collect $18 which he had loaned Prince earlier that day at "a little street crap game." Answering the door, Prince asked the defendant for change in order to pay him the amount owed. The defendant reached into his pocket as if to make change but, instead, pulled out a gun,[1] pushed Prince inside to a bedroom, turned out the bedroom light, and demanded all of Prince's money. Prince gave the defendant the $50 he had in his pocket and tried to "slip to the kitchen . . . to get a stick or knife or something" because he heard the

_____

[1] Prince testified that the gun "looked like a Saturday Night Special . . . a .22, snub nose."

defendant "saying something" to Sutton, who was "still in the bathroom or down the hall" with her son. However, the defendant saw Prince and fired a shot at him. Frightened, Prince then "snatched the whole door down" and ran out of the house to a pay phone to call the police because the house phone had been disconnected. A few minutes later, he saw a police car and flagged down the officers to inform them that he was the person who had called. He then rode with the officers back to the house where he saw Sutton, who was nude, "screaming and crying," and "looked like she had been beaten because her head was all swollen," coming from behind a neighbor's house. He said that the police apprehended the defendant "from back behind the houses back there."

On cross-examination, Prince admitted that he had five prior convictions for robbery, as well as convictions for facilitation of a felony and theft of property under $500, and that he was still on probation for the facilitation charge.

Officer Michael David Bishop of the Memphis Police Department testified that he was dispatched to 1039 North Dunlap around 5:00 a.m. on July 29, 2000, and, while en route, was flagged down by Robert Prince about three blocks from Dunlap Street. Officer Bishop, his partner, and Prince then proceeded to the victims' residence, arriving at about 5:19 a.m. There, he observed that the "front door had been kicked in and the window had been broken out in front of the house." After checking the house, Officer Bishop returned to his police car to interview Prince and saw a naked woman standing on the porch at 1043 North Dunlap. The woman, who was very upset and angry, told Officer Bishop that she had been raped, both vaginally and orally. The victim then showed the officers where the rape occurred at 1049 North Dunlap, "which was one house north of 1043 where she was standing on the porch." Officer Bishop observed clothes on the ground in the back of 1049 North Dunlap and "saw somebody running that fit the description of the suspect that we were given." Bishop and three other officers pursued and apprehended the defendant, who was wearing blue jogging pants, a gray pullover sweatshirt, and a dark blue bandana, in the area of 1025 North Dunlap. As Officer Bishop was putting the defendant in the back of his squad car, Prince and Sutton attacked the defendant.

Officer Max Brown of the Memphis Police Department testified that he received a broadcast for a disturbance in the area of 1039 North Dunlap on July 29, 2000, and proceeded to the scene. Several officers were already present and a suspect had been taken into custody when he arrived. Officers began "looking for the pistol that was dropped," and Officer Brown found it on the ground behind 1025 North Dunlap where the defendant was apprehended. Brown described the pistol as a "small revolver, looked like a Saturday Night Special and . . . it had a cracked handle on it."

Officer Mark Rewalt of the Memphis Police Department Crime Scene Unit testified that he arrived at the scene at about 6:20 a.m. to collect evidence. He first went to 1039 North Dunlap where he took photographs of the disarray inside the house, a broken living room window, broken glass and a metal folding chair below the window, and three live Remington .22-caliber rounds found on the front porch underneath the window. He next went to the backyard of 1049 North Dunlap, where he took photographs of the victim's clothing lying on the ground. Officer Rewalt also photographed a gun, loaded with two spent .22-caliber casings, which was found in some weeds in

the back of the garage at 1025 North Dunlap. Rewalt identified the gun as a "RG .22 caliber, six-shot revolver with the serial number grinded off it and missing the pin that holds the cylinder in."

The defendant testified that he had known Robert Prince for about a year and had been to Prince's residence on four or five previous occasions to sell drugs to him and had seen Rosemary Sutton there. Prince came to the defendant's apartment complex on July 28, 2000, and told the defendant to come to his house later that day and he would pay the defendant the $65 he owed for drugs. The defendant walked to Prince's house "[l]ater on that night . . . probably . . . around 1 that morning." He knocked on the door, and Prince let him inside. When he asked Prince for the money, Prince replied, "I ain't got your mother fucking money right now but I'm going to give it to you." The defendant then hit Prince with his fist, and the two began fighting. Because Prince said he was going to get a gun, the defendant pulled out his gun and shot at Prince. Prince ran to a bedroom, and Ms. Sutton suddenly appeared and hit him "with something upside [his] head." The defendant then hit Ms. Sutton once with his gun and more than once with his fist. While he and Ms. Sutton were fighting in the living room, the defendant saw Prince run out the kitchen door and saw "a little boy." Ms. Sutton then ran out the front door; the defendant ran out behind her and went to look for Prince.

Unable to locate Prince, the defendant returned to the house and broke out the front living room window with his gun, causing the pin to fall out of the gun. When the defendant saw the police coming, he took off running and, seeing Ms. Sutton down the street, told her, "[T]hey didn't have my money next time I came around here, I was going to do more than bust they [sic] window out." The defendant said the police caught him behind a shed and took him to the Regional Medical Center "[b]ecause the police and the victim had jumped on [him]." He was later taken to the police station where he gave a statement and "volunteered to take a DNA test." The defendant denied raping Ms. Sutton and denied pointing a gun at her or her son, William Turner, but admitted that he always carried a gun with him.

## ANALYSIS

### Sufficiency of the Evidence

The defendant asserts that the evidence presented at trial was insufficient to support his convictions for aggravated rape and aggravated assault because the jury discredited the testimony of Robert Prince and there was no physical evidence that Rosemary Sutton had been raped.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a

reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction for aggravated rape, the State was required to prove:

> (a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]

Tenn. Code Ann. § 39-13-502(a)(1).

To obtain a conviction for aggravated assault, the State was required to prove:

> (a) A person commits aggravated assault who:
>
> (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
>
> . . . .
>
> (B) Uses or displays a deadly weapon[.]

Tenn. Code Ann. § 39-13-102(a)(1)(B).

Rosemary Sutton testified that she was raped by the defendant, pointing his pistol at and threatening both her and her three-year-old son, who was "screaming . . . panicking . . . hysterical." She testified that the defendant forcibly penetrated her vagina with his penis while threatening her with a gun. Officer Bishop also testified that when he arrived at the crime scene, he saw Sutton naked and visibly upset. Evidence collected at the scene included Sutton's grass-stained boxers, underwear, and torn, bloodstained T-shirt, as well as the defendant's pistol. Although the defendant testified as to a different scenario than did the State's witnesses, it is apparent from the verdicts that the jury accepted their testimony rather than that of the defendant. This was the prerogative of the jury, and we conclude that the evidence easily supports its determination.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of a corrected judgment in No. 00-14457 to reflect the defendant's conviction offense of aggravated rape, which was omitted from the judgment form.

_____
ALAN E. GLENN, JUDGE